**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | | |
|---|---|---|
| Elisha Cunningham, Lakeisha Martin, Shantel Ray,<br><br>Plaintiffs,<br><br>v.<br><br>R&E Automated Systems, LLC,<br><br>Defendant. | ) | Civil Action No. 7:24-cv-6431-TMC<br><br>**ORDER** |

Plaintiffs Elisha Cunningham, Lakeisha Martin, and Shantel Ray brought this action in state court against their former employer, Defendant R&E Automated Systems, LLC, for alleged violations of Title VII of the Civil Rights Act and 42 U.S.C. § 1981. (ECF No. 1-1). Specifically, Plaintiffs collectively allege that Defendant retaliated against them for engaging in protected activity and subjected them to disparate treatment. *Id*. Cunningham and Ray also allege Defendant violated Title VII and § 1981 by subjecting them to a hostile work environment. *Id*. Defendant removed the case to federal court, (ECF No. 1), and, following discovery, filed separate motions for summary judgment as to each plaintiff, (ECF Nos. 27, 28, 29). Those motions have been fully briefed. (ECF Nos. 32, 33, 34, 39, 40, 41). Now before the court is the magistrate judge's[1] report and recommendation ("Report"), recommending the motions for summary judgment as to Cunningham and Martin be denied and that the motion for summary judgment as to Ray be granted as to her hostile work environment claims and denied as to her disparate treatment and retaliation claims. (ECF No. 43). Ray and Defendant filed objections to the Report, (ECF Nos. 44, 45), and

[1] This matter was referred to a magistrate judge pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B), D.S.C.

this matter is ripe for review. The court finds a hearing is not necessary to rule on the motions. Local Civ. Rule 7.08. (D.S.C.).

**BACKGROUND**

Defendant operates a facility in Duncan, South Carolina where it carries out manufacturing processes for the automotive industry. Plaintiffs, who are Black, began working at the facility in 2022. (ECF No. 1-1 at 4).[2] On November 21, 2023, Ray overheard her multiracial co-worker, David Almestica,[3] use the n-word. (ECF No. 28-6 at 4), Ray Dep. Tr. 8:1-3. According to Ray's written statement, Almestica walked past her "looking at the guy[4] who was tightening down parts and said that motherfucking n[*****]." (ECF No. 27-12). Ray reported the incident to Defendant's on-site Human Resources representative, Linda Bound (White),[5] as well as Almestica's supervisor,[6] Ken Diprete, who told Ray "he would handle it." (ECF Nos. 28-6 at 4, 32-6 at 13), Ray Dep. Tr. 8:19, 13:12-20. Afterwards, Ray stopped by Cunningham's office, told her Almestica

[2] The court is mindful of Defendant's objections to the Report that take issue with the magistrate judge "repeatedly rel[ying] on allegations in the Plaintiffs' Complaint as if they were established facts, notwithstanding record evidence that directly contradicts those allegations." (ECF No. 45 at 2-3). However, the court cites to the complaint in this instance as the parties do not dispute the year Plaintiffs started working for Defendant.

[3] *See* (ECF No. 27-11 at 4-5), Belue Dep. Tr. 29:19-23, 30:3-6 (where one of Almestica's co-workers testified Almestica is "half-black, half some kind of Hispanic" then clarified Almestica's mother is Puerto Rican and his father is Black); (ECF No. 32-3 at 27, 78), Diprete Dep. Tr. 44:1-2, 107:1-2 (where Almestica's supervisor testified Almestica is Hispanic, not Black).

[4] Ray testified this employee was a Black male. (ECF No. 32-6 at 13), Ray Dep. Tr. 13:1-6. However, Jacob Belue (White), who was working with Almestica at the time, testified Almestica was referring to Belue when he used the term. (ECF No. 32-2 at 37), Belue Dep. Tr. 61:20-24.

[5] (ECF No. 32-5 at 8, 10), Bound Dep. Tr. 18-22; 43:15-16.

[6] (ECF No. 32-2 at 7-8), Belue Dep. Tr. 25:22-26:4.

had used the n-word,[7] and asked her if Almestica had used the term before. (ECF No. 32-6 at 8), Ray Dep. Tr. 8:20-23. Cunningham informed Ray that Almestica "had said it on many instances and had been talk[ed] to about it," and Ray went back to work. *Id.*, Dep. Tr. 8:20-25. Around 1:00 p.m., Ray walked past Martin's work area and informed Martin that Almestica called a Black employee the n-word. (ECF No. 28-4 at 4-5), Martin Dep. Tr. 7:16-8:3.

Later that day, Martin spoke with both Ray and Cunningham about Almestica's use of the n-word that morning. (ECF No. 28-4 at 7), Martin Dep. Tr. 10:7-13. Martin told Cunningham to get Belue off the floor "to figure out what happened [earlier] in HR." *Id.*, Martin Dep. Tr. 10:16-20. After Cunningham brought Belue to the office, Plaintiffs asked him about HR's investigation into that morning's incident with Almestica. *Id*. at 8-9, 13, Martin Dep. Tr. 11:22-12:3, 13:1-11. Shortly thereafter, Diprete and manager Dylan Dunn[8] appeared, and everyone went back to work. (ECF No. 32-1 at 26), Cunningham Dep. Tr. 29:3-13. Defendant subsequently terminated Plaintiffs' employment, and this lawsuit followed.

## LEGAL STANDARD

The recommendations set forth in the Report have no presumptive weight, and this court remains responsible for making a final determination in this matter. *Elijah v. Dunbar*, 66 F.4th 454, 459 (4th Cir. 2023) (citing *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976)). The court is charged with making a *de novo* determination of those portions of the Report to which a specific objection is made, and the court may accept, reject, modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1). Thus, "[t]o trigger de novo review, an objecting party 'must object to the finding or

[7] (ECF No. 32-1 at 8), Cunningham Dep. Tr. 10:1-5.

[8] (ECF No. 32-3 at 34, 38), Diprete Dep. Tr. 51:5-6, 55:13-14.

recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" *Elijah*, 66 F.4th at 460 (quoting *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007)). However, the court need only review for clear error "those portions which are not objected to—including those portions to which only 'general and conclusory' objections have been made[.]" *Dunlap v. TM Trucking of the Carolinas, LLC*, 288 F. Supp. 3d 654, 662 (D.S.C. 2017); *see also Elijah*, 66 F.4th at 460 (noting that "[i]f a litigant objects only generally, the district court reviews the magistrate's recommendation for clear error only"). Furthermore, "'the court is not obligated to consider new arguments raised by a party for the first time in objections to the magistrate's Report.'" *Floyd v. City of Spartanburg S. Carolina*, Civ. A. No. 7:20-cv-1305-TMC, 2022 WL 796819, at *9 (D.S.C. Mar. 16, 2022) (quoting *Elliott v. Oldcastle Lawn & Garden, Inc.*, No. 2:16-cv-01929-DCN, 2017 WL 1206408, at *3 (D.S.C. Mar. 31, 2017); *see also Elijah*, 66 F.4th at 460 n. 3 (noting "district court judges are not required to consider new arguments posed in objections to the magistrate's recommendation").

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56 mandates entry of summary judgment "'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Phillips v. Nlyte Software Am. Ltd.*, 615 F. App'x 151, 152 (4th Cir. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

"'In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party.'" *Sellers v. Keller Unlimited LLC*, 388 F. Supp. 3d 646, 649 (D.S.C. 2019) (quoting *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996)). However, "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *McKinney v. G4S Gov't Sols., Inc.*, 711 F. App'x 130, 134 (4th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the burden of proving that summary judgment is appropriate. *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Lane & Roderick, Inc.*, 736 F. App'x 400 (4th Cir. 2018) (citing *Celotex Corp.*, 477 U.S. at 322-23). Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015).

## DISCUSSION

### I. Hostile Work Environment

Cunningham and Ray each bring causes of action for hostile work environment in violation of Title VII and 42 U.S.C. § 1981.[9] (ECF No. 1-1). Defendant moves for summary judgment as to both plaintiffs' claims. (ECF Nos. 27, 29). The magistrate judge recommends the court deny summary judgment on Cunningham's hostile work environment claims and grant summary judgment on Ray's claims. (ECF No. 43). Defendant objects to the magistrate judge's recommendation concerning Cunningham's hostile work environment claims, (ECF No. 45), and

[9] Martin does not bring a hostile work environment claim.

Ray objects to the magistrate judge's recommendation concerning her claims, (ECF No. 44). Accordingly, the court will review the portions of the Report addressing the hostile work environment claims *de novo*.

Section 1981 provides "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "An employer contravenes § 2000e–2(a)(1) by, inter alia, requiring an African-American employee to work in a racially hostile environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276-77 (4th Cir. 2015). "A hostile environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 277 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (internal quotation marks omitted).

The test for determining whether a work environment is racially hostile is the same for claims brought under Title VII as for claims brought under § 1981. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001). To establish a claim for hostile work environment, Cunningham and Ray must show (1) unwelcome conduct; (2) that is based on their race; (3) which is sufficiently severe or pervasive to alter their conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer. *Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018).

**1. Cunningham's Hostile Work Environment Claims**

In its memorandum in support of its motion for summary judgment as to Cunningham, Defendant argues:

> Cunningham's hostile work environment claim is based on a single co-worker's use of the n-word,[10] and no other alleged workplace conduct. To be clear, Cunningham does not allege that [Almestica] ever used the n-word directed at her; instead, she alleges that she overheard him say it when speaking with other employees.

(ECF No. 27-1 at 17) (internal citations omitted). Defendant further asserts it did not fail to take effective action to stop any harassment. *Id.* According to Cunningham, however, "Defendant's argument fails because Almestica referred to black co-workers as [the n-word] on a daily basis around Cunningham, and because Defendant completely failed to stop the months-long harassment." (ECF No. 32 at 14). The court agrees with Cunningham that summary judgment for Defendant is not appropriate on *her* hostile work environment claims.

**A. Unwelcome Conduct**

The requirement that the conduct at issue be unwelcome is subjective. *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 781 (4th Cir. 2023). During her employment with Defendant, Cunningham heard Almestica use the n-word, and she *reported* his conduct to Diprete. *See, e.g.*, (ECF No. 27-4 at 10), Cunningham Dep. Tr. 32:15-24 (testifying she reported Almestica's use of the n-word to their supervisor the first time she heard Almestica use the term and every time thereafter). Accordingly, viewing the facts in the light most favorable to Cunningham, there is evidence in the record from which a jury could determine Almestica's use of the n-word was unwelcomed.

---

[10] Cunningham testified that Almestica was the only individual she heard use the n-word at work. (ECF No. 27-4 at 10, 14), Cunningham Dep. Tr. 32:12-14, 36:6-8.

**B. Conduct Based on Race**

The record contains multiple reports of Almestica using the n-word at work. For example, in August or September 2023, Cunningham overheard him say "[t]hese mother[*******] n[******] lazy." (ECF No. 27-4 at 10), Cunningham Dep. Tr. 32:15-22. While Defendant attempts to minimalize Almestica's use of the n-word by pointing to Belue's testimony that Almestica regularly used the n-word by "put[ing] the A on the end of it" "like to call me bro,"[11] (ECF No. 45 at 7), the court finds a reasonable jury could find Almestica's use of the n-word was based on race.[12] *See, e.g.*, *Spriggs*, 242 F.3d at 185 (recognizing the n-word "is pure anathema to African-Americans").

**C. Sufficiently Severe or Pervasive**

"In measuring whether the offensive conduct is severe or pervasive enough to warrant relief, [the court] must look at the totality of the circumstances, including: the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)). "'[I]n the Fourth Circuit, the question of whether 'harassment was sufficiently severe or pervasive is quintessentially a question of fact.'" *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997) (quoting *Paroline v.*

[11] Belue testified Almestica used the n-word on a daily basis but "wasn't like being racist about it." (ECF No. 27-11 at 4), Belue Dep. Tr. 29:2-18. When asked if Almestica ever used the n-word to refer to a Black person, Belue testified "I'm sure of it, to be honest with you." *Id*. at 5, Dep. Tr. 30:7-9. He denied ever hearing Almestica use the variation of the n-word that ends in "er." *Id*., Dep. Tr. 30:20-24.

[12] Defendant does not address that Cunningham reported hearing Almestica use the variation of the n-word that ends in "er."

*Unisys Corp.*, 879 F.2d 100, 105 (4th Cir. 1989), *vacated in part on other grounds*, 900 F.2d 27 (4th Cir.1990) (en banc)). "Nonetheless, Title VII does not create a 'general civility code' in the workplace; it only proscribes behavior that is 'so objectively offensive as to alter the "conditions" of the victim's employment.'" *Mosby-Grant*, 630 F.3d at 335 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

Cunningham testified during her deposition she first heard Almestica use the n-word in August or September 2023. (ECF No. 27-4 at 10), Cunningham Dep. Tr. 32:15-19. Specifically, she overheard him say "[t]hese mother[*******] n[******] lazy." *Id.*, Dep. Tr. 32:20-22. Cunningham reported the incident to Diprete, who told Cunningham he would handle it. *Id.* at 10-11, Dep. Tr. 32: 23-33:1. A day or two later, Cunningham overheard Almestica say "[t]hese n[******] ain't shit. These n[******] ain't worth a damn. N[*****], n[*****], n[*****]." *Id.* at 11, Dep. Tr. 33:4-9. Cunningham reported it to Diprete, who responded "Again?" *Id.*, Dep. Tr. 33:10-15. A couple of days after the second incident, Cunningham overheard Almestica say "[t]hese n[******] don't do shit." *Id.*, Dep. Tr. 33:16-21. Cunningham again reported the incident to Diprete, who, this time, held a floor meeting. *Id.* at 11-12, Dep. Tr. 33:22-34:1. During that meeting, which Cunningham estimates occurred in October 2023, Diprete warned those present, which included Almestica, that any further use of the n-word will result in immediate termination. *Id.* at 12, Dep. Tr. 34:5-10. According to Diprete, he *and Dunn* subsequently:

> went to [Bound] and explained to [her] – look this is what happened. We had a meeting with the line. Here's the – the sign in sheet for the meeting. We got it handled. She said, okay, you guys got it handled. Good. And that was the end of it for a while until this whole situation came up again.

(ECF No. 32-3 at 37), Diprete Dep. Tr. 54:17-22.

Despite Diprete's warning about further use of the n-word, Cunningham testified *she* heard Almestica use the n-word multiples times after the meeting and that she reported each incident to

Diprete. (ECF No. 27-4 at 12-14), Cunningham Dep. Tr. 33:14-35:25. Later in her deposition, however, Cunningham clarified that, after early October, *she* did not *personally* hear Almestica use the n-word; however, she heard from other employees that he was continuing to use the term. (ECF No. 32-1 at 49-50), Dep. Tr. 105:9-106:25. She testified she reported Almestica's use of the n-word to Diprete every week from August or September 2023 to November 21, 2023. (ECF No. 27-4 at 13), Dep. Tr. 35:18-21. Diprete, however, could only recall Cunningham reporting Almestica's use of the n-word to him on the one occasion that resulted in him holding the aforementioned floor meeting. (ECF No. 27-2 at 7), Diprete Dep. Tr. 175:17-19.

Though Cunningham initially testified Diprete was the only person to whom she reported Almestica's conduct, later in her deposition she testified she informed Bound at the end of October or beginning of November 2023 that Almestica was using the n-word when it appeared Diprete "wasn't getting [anywhere]." (ECF No. 32-1 at 42), Cunningham Dep. Tr. 88:7-13 According to Cunningham, Bound "told [her] to give her a moment, let her, you know, see what can be done." *Id.* at 43, Dep. Tr. 89:6-8. Bound also told her "not to discuss – not to let anybody know that [Almestica] had been calling [them] the N word." *Id.* at 42, Dep. Tr. 88:7-13. Despite Cunningham's testimony that she reported an incident involving Almestica to Bound *and* Diprete's testimony that he informed Bound of the aforementioned floor meeting immediately afterwards, Bound denied knowing *anything* about Almestica using the n-word before November 21, 2023.[13] (ECF No. 32-5 at 16, 20); Bound Dep. Tr. 67:1-16, 71:22-25.

---

[13] Bound claims she did not become aware of the October 2023 floor meeting until after the events of November 21, 2023. (ECF No. 32-5 at 17-19), Bound Dep. Tr. 68:3-69:1, 71:2-7. While Diprete testified he gave her the sign-in sheet for the meeting, the sign-in sheet has not been located, and Bound testified "there was nothing" related to the floor meeting. *Id.* at 20, Dep. Tr. 71:11-16. *See also* (ECF No. 32-9 at 9), Komini Dep. Tr. 45:3-6 (wherein Defendant's CFO testified "[n]o such sign in sheet exists").

Cunningham also testified that, two weeks after reporting to Bound, she informed Dunn that she heard Almestica use the n-word, and Dunn told her not to discuss it. (ECF No. 32-1 at 43-44), Cunningham Dep. Tr. 43:9-90:5. Dunn, however, also did not corroborate her testimony. Specifically, while Diprete testified he and Dunn went to Bound after the aforementioned floor meeting, Dunn testified he could not recall any issues with Almestica using the n-word before November 21, 2023. (ECF No. 27-9 at 3), Dunn Dep. Tr. 35:4-8.

Defendant argues that, in its analysis of Cunningham's hostile work environment claims, the court should only consider Cunningham's report to Diprete that led to the October floor meeting and Ray's report to Diprete on November 21, 2023 that led to Almestica's termination because those are the only reports of Almestica's use of the n-word that are corroborated in the record. (ECF No. 45 at 5-6). The court acknowledges the inconsistencies in Cunningham's deposition testimony as well as the lack of corroborating evidence supporting her testimony that she reported Almestica's conduct multiple times and to multiple individuals. However, the court "cannot weigh the evidence or make credibility determinations" on a motion for summary judgment. *Guessous v. Fairview Prop. Invs*., 828 F.3d 208, 216 (4th Cir. 2016). Additionally, the court must view the evidence in the light of the nonmoving party, Cunningham, for purposes of summary judgment. *Id*. Therefore, the court will consider Cunningham's testimony that she made multiple reports to multiple individuals in its analysis of the instant summary judgment motion.

Even considering that testimony, however, Defendant contends Cunningham failed to show the conduct at issue was severe or pervasive because Almestica did not direct the n-word towards her or in reference to her.[14] (ECF No. 45 at 6-7). According to Defendant, "overheard

[14] To be sure, *Cunningham* testified she never heard Almestica use the term directed at her or in reference to any specific Black employee. (ECF Nos. 27-4 at 25; 32-1 at 36), Cunningham Dep. Tr. 11-18, 82:11-18.

remarks, particularly where not aimed at the plaintiff," "cannot support a race-based hostile-work environment claim." (ECF No. 45 at 7). In making such assertion, Defendant cites to *Mosby-Grant v. Hagerstown*, 630 F.3d 326 (4th Cir. 2010) and *White v. Federal Exp. Corp.*, 939 F.2d 157 (4th Cir. 1991), but those cases are inapposite to this case and do not support Defendant's broad assertion that overheard remarks can never be used to support a hostile work environment claim.

In *Mosby-Grant*, the court held the Black plaintiff could not establish a hostile work environment based on race because there was only a "*single incident* wherein [she] overheard racist comments" and the individual "immediately apologized, and explained that he and the biracial recruit had been joking with one another." 630 F.3d at 336 (emphasis added). The Fourth Circuit recognized that, in addition to the aforementioned isolated incident, "another recruit did openly disparage Mexicans," but it noted "his repugnant remarks were made only two times in five months, [and] his remarks were also never directed at" the plaintiff. *Id*. In *White*, the Fourth Circuit concluded the district court erred in finding the Black plaintiff had a cause of action for a racially hostile environment, noting the district court's finding "rests on *one specific incident* of racially offensive remarks exchanged by a black and a white courier, combined with a general finding of conflicts over music selection on the loading docks, allegations that black employees were admonished to return to work when white employees were not, and allegations of unequal advancement for black and white employees." 939 F.2d at 160 (emphasis added). These cases, unlike the instance case, did not involve frequent offensive conduct made in the plaintiffs' presence and/or with the plaintiffs' knowledge.

Further, Defendant's assertion that overheard remarks not directed at the plaintiff can never be used to support a hostile work environment claim cannot be reconciled with Fourth Circuit precedent that allows courts to consider statements made *to others even outside a plaintiff's*

*presence* when analyzing hostile work environment claims. For example, the Fourth Circuit has explained:

> ***the fact that an employee does not witness statements made to third parties does not bar their consideration***. *Jennings*, 482 F.3d at 692 n.1, 697-98. This makes sense because the environment an employee experiences would, in addition to his own treatment, include information he obtains about similar treatment of others ***even if he did not witness that treatment***.
>
> Based on our precedent, the evidence of racially offensive conduct that [a plaintiff] heard about second-hand should not be disregarded simply because he did not witness it.

*Perkins v. Int'l Paper Co.*, 936 F.3d 196, 210 (4th Cir. 2019) (emphasis added). Accordingly, while, arguably, an offensive remark that is not directed at the plaintiff may not carry the same weight in terms of severity as an offensive remark directed at her, there is evidence that Cunningham overheard Almestica using the n-word towards others *and* that she was personally aware of Almestica using the term outside her presence.

Ultimately, given the offensive and derogatory nature of the n-word as well as the number of times Cunningham testified she either personally heard Almestica use the term or became aware of his use of the term during her last four months of employment with Defendant, the court finds, within the context of a motion for summary judgment, Cunningham has set forth enough evidence from which a reasonable jury could conclude Almestica's unwelcomed, racially-based conduct was severe or pervasive to satisfy this element of her hostile work environment claims.

**D. Imputable to Defendant**

"If the harassing employee is the victim's co-worker," like in this case, "the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). That is, "the employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree v. Scollon*

*Prods., Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003). "An employer cannot avoid Title VII liability for coworker harassment by adopting a 'see no evil, hear no evil' strategy. ***Knowledge of harassment can be imputed to an employer if a 'reasonable person, intent on complying with Title VII,' would have known about the harassment***." *Ocheltree*, 335 F.3d at 334 (quoting *Spicer v. Commonwealth. of Va., Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995)) (emphasis added). "[T]here is no 'exhaustive list' or 'particular combination' of remedial measures or steps that an employer need to employ to insulate itself from liability," but the Fourth Circuit has considered "the promptness of the employer's investigation when complaints are made, whether offending employees were counseled or disciplined for their actions, and whether the response was actually effective." *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011).

As set forth above, Cunningham testified she was aware of Almestica using the n-word on numerous occasions between August 2023 to November 2023 and that she reported his use of the term to Bound, Diprete, and Dunn during that timeframe. Further, both Bound and Defendant's CFO testified that, under "normal circumstances," Defendant should have terminated Almestica following the first report of him using the n-word.[15] However, Defendant did not take any disciplinary measures against Almestica until Ray reported his conduct on November 21, 2023, which resulted in his termination.[16] (ECF No. 27-10 at 4), Neal Dep. Tr. 58:3-8. Based on the

[15] (ECF No. 27-3 at 15, 34), Komini Dep. Tr. 67:13-15, 114:2-14; (ECF No. 27-8 at 3), Bound Dep. Tr. 72:4-9.

[16] Defendant argues "the undisputed record shows that [it] took prompt and effective action at every stage." (ECF No. 45 at 8). In doing so, it, again, only addresses its response to the report Cunningham made to Diprete that resulted in the floor meeting and Ray's report to Diprete that resulted in Almestica's termination. *Id*. It does not address the efforts, or lack thereof, it made to address the reports Cunningham made following the meeting in early October 2023 until Almestica's termination. Again, the court understands there are credibility concerns regarding Cuningham's testimony that she made such reports. However, as stated, the court cannot make credibility determinations on a motion for summary judgment. Thus, at this juncture, the court will

foregoing, the court finds there is sufficient evidence from which a jury could find Defendant knew or should have known about Almestica's conduct and failed to take effective action to stop it. Therefore, the court agrees with and adopts the magistrate judge's recommendation, overrules Defendant's objections as to Cunningham's hostile work environment claims, and denies Defendant's motion for summary judgment to the extent it seeks to dismiss these claims.

**2. Ray's Hostile Work Environment Claims**

In its memorandum in support of its motion for summary judgment as to Ray, Defendant provides:

> Ray's hostile work environment claim is based on a co-worker's single use of the n-word, and no other alleged workplace conduct. To be clear, Ray does not allege that [Almestica] ever used the n-word directed at her; instead, she alleges that she overheard him say it when speaking with another employee. Further, when Ray reported [Almestica's] alleged use of the n-word on November 21, 2023, Diprete immediately took the matter to HR, which resulted in [Almestica] being promptly terminated.

(ECF No. 29-1 at 16). Ray contends this "argument fails because Almestica referred to black co-workers as [the n-word] on a daily basis, and because Defendant completely failed to stop Almestica's use of the slur." (ECF No. 33 at 14). The court agrees with Defendant that summary judgment should be granted in its favor as to Ray's hostile work environment claims.

It is undisputed that the November 21, 2023, incident was the only time *Ray* ever personally heard the n-word used at work. (ECF No. 28-6 at 7), Ray Dep. Tr. 32:23-25. There is also no indication she was aware of any prior use of the n-word at work before that date.[17] Ray posits that

---

consider Cunningham's testimony that she made such reports. Furthermore, there is no indication Defendant conducted an investigation into Almestica's conduct or disciplined Almestica for his conduct after the floor meeting.

[17] In fact, during her deposition, Ray testified that when she reported Almestica's use of the slur to Diprete and Diprete said "not again," she inquired, "what do you mean, not again? And then I

"a single utterance of [the n-word] . . . is actionable," (ECF No. 33 at 16), but the court does not find that to be the case in this instance given, among other things, that Almestica was Ray's co-worker, not supervisor, and, importantly, Almestica was terminated on the very same day Ray became aware of his use of the n-word. *See, e.g.*, *Faragher*, 524 U.S. at 788 (explaining "simple teasing, offhand comments, and *isolated* incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (internal citations and quotation marks omitted) (emphasis added); *Boyer-Liberto*, 786 F.3d at 278 (recognizing "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., 'a supervisor's use of a racial epithet impacts the work environment far more severely than use by co-equals'") (quoting *Rodgers v. W.–S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir.1993)).

The magistrate judge reached the same conclusion in his Report. In her objections thereto, Ray argues the magistrate judge erred in determining Almestica's persistent use of the n-word in the workplace did not create a hostile work environment *as to her*. (ECF No. 44 at 1). She also argues "Defendant's negligence in addressing *Cunningham's* complaints for months directly establishes Defendant's negligence in addressing [her] complaint as well." *Id*. (emphasis added). However, Cunningham, unlike Ray, had knowledge of Almestica's use of the n-word at work as early as August or September 2023. Because Ray was unaware of any prior use of the n-word at work until November 21, 2023, which was her last full day working for Defendant, Ray cannot use Almestica's prior use of the n-word or Defendant's unsuccessful attempts to quell such conduct to satisfy the elements of her claims. *See Perkins*, 936 F.3d at 211 (confirming "that information about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience.

---

just said, nevermind, I just want to talk about what just occurred." (ECF No. 29-4 at 5), Ray Dep. Tr. 8:15-18.

Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim"); *Parks v. Louisiana-Pac. Corp.*, 400 F. Supp. 3d 393, 411 (W.D.N.C. 2019) (explaining "[i]n considering whether Plaintiff's harassment is imputable to [employer], the Court only considers those acts which Plaintiff himself testified to as the basis for his hostile work environment claim, not a general atmosphere at [the employer]"); *Norris v. City of Anderson*, 125 F. Supp. 2d 759, 768-69 (D.S.C. 2000) (providing "[e]vents of which Plaintiff had no knowledge cannot support a hostile environment claim, because a person cannot perceive an act as hostile if he is not aware of its existence"). Accordingly, the court adopts the magistrate judge's recommendation as to these claims, overrules Ray's objections, and grants Defendant's motion for summary judgment to the extent Defendant moves for summary judgment on Ray's hostile work environment claims. Such claims are hereby dismissed.

## II. Discrimination/Disparate Treatment

Cunningham, Martin, and Ray bring causes of action for discrimination in violation of Title VII and 42 U.S.C. § 1981. (ECF No. 1-1). Defendant moves for summary judgment as to each plaintiff. (ECF Nos. 27, 28, 29). The magistrate judge recommends the motions be denied as to these claims. (ECF No. 43). Defendant objects to the recommendation. (ECF No. 45). Accordingly, the court will also review this portion of the Report *de novo*.

For their § 1981 and Title VII race discrimination claims,[18] Plaintiffs proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Plaintiffs must first establish a *prima facie* case of disparate treatment by proving the following elements: "'(1) membership in a protected class; (2) satisfactory job performance;

[18] *See McPherson v. Emp. Source, Inc.*, No. 5:23-cv-345-D, 2026 WL 917514, at *7 (E.D.N.C. Mar. 31, 2026) (recognizing "the analysis for a Title VII race discrimination claim and section 1981 race discrimination claim are identical").

(3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024) (quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)). If Plaintiffs are able to establish a prima facie case, "'the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action.'" *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 256 (4th Cir. 2025) (quoting *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007)). If Defendant carries its burden, "the burden shifts back to [Plaintiffs] to produce evidence sufficient to create a material issue of fact as to whether [the employer's] alleged reason for firing [them] was not its true reason, but rather a pretext for discrimination." *Wannamaker*, 126 F.4th at 257.

**1. Prima Facie Case**

It is undisputed Plaintiffs are members of a protected class and were subject to an adverse employment action. As to their prima facie case, the issues are whether Plaintiffs were performing satisfactorily and whether they were treated differently from similarly situated employees outside their protected class. (ECF Nos. 27-1 at 19, 21-24; 28-1 at 16-19; 29-1 at 19-21). Before getting into these issues, the court provides a discussion of the details surrounding Plaintiffs' terminations to give context for its analysis of their discrimination claims and retaliation claims.

**A. Plaintiffs' Termination**

In her deposition, Bound testified that, on November 21, 2023, Diprete came to her and told her that Ray reported Almestica using the n-word. (ECF No. 32-5 at 21), Bound Dep. Tr. 72:15-22. Diprete also told Bound that Almestica and Belue were working together at the time, and Almestica used the n-word with an "a" ending. *Id.*, Dep. Tr. 72:23-25. Bound subsequently met with Belue twice on November 21, 2023. During the first meeting, she claims she asked him

what happened, and Belue wrote a statement. *Id*. at 22, Dep. Tr. 73:9-19. Bound denied helping Belue write the statement or having "anything to do with the statement." (ECF No. 32-5 at 29-30), Dep. Tr. 84:22-85:4. According to Bound, Belue did not appear nervous, and he confirmed Almestica had used the n-word that morning. *Id*. at 29, Dep. Tr. 84:7-19. Bound then met with Ray and told her to write a statement.[19] *Id*. at 22-23, 35, Dep. Tr. 73:21-74:1, 103:13-18. Bound met with Belue again following Belue's meeting with Plaintiffs, and Bound testified "[h]e was kind of a wreck at that point." *Id*. at 29, Dep. Tr. 84:19-20. According to Bound, Diprete, Dunn, and Belue were all in her office, and Belue told her that he felt "intimidated" and that he was "scared of [Plaintiffs]." (ECF Nos. 27-8 at 14; 32-5 at 23), Dep. Tr. 74:10, 137:23-25. She also stated Belue was "almost in tears, saying, I'm not dealing with this. I'm not dealing with them. I'm not going to be harassed by anybody." (ECF No. 32-5 at 24); Dep. Tr. 75:1-6.

Belue, however, provided a different account during his deposition. He testified that, on November 21, 2023, he first became aware that something was going on when his co-worker, Edward Martin (Black)[20] (hereinafter "Edward"), pulled him to the side and asked Belue if Almestica had said the n-word. (ECF No. 32-2 at 15), Belue Dep. Tr. 37:1-25. Belue responded in the affirmative, and Edward along with his co-worker, Lideveas Payne (Black),[21] subsequently went to the breakroom and confronted Almestica. *Id*. at 16-17, Dep. Tr. 38:20-25, 39:3-25. Afterwards, Almestica, Belue, Edward, and Payne were all pulled into Bound's office for a

---

[19] Ray testified that when she went to speak with Bound, Bound "was angry and even cursed at [her]," telling her to "[w]rite a damn statement." (ECF No. 32-6 at 17), Ray Dep. Tr. 20:13-15. Ray told Bound that Belue had also heard Almestica use the n-word, and Bound allegedly responded "no he didn't." *Id*., Dep. Tr. 20:15-17.

[20] (ECF No. 32-3 at 20), Diprete Dep. Tr. 172:22-23.

[21] (ECF No. 32 at 3).

meeting with Bound, Diprete, and Dunn. *Id*. at 20, Dep. Tr. 43:8-11. According to Belue, Edward was "irate," and Bound fired him.[22] *Id*. at 20, 22, Dep. Tr. 43:22-25, 46:16-25. *During this meeting*, Belue denied hearing Almestica use the n-word that morning "because all that stuff was going on, and we was all in the little room." *Id*. at 21-22, Dep. Tr. 44:20-45:5. Belue explained, at that point, he was worried about getting fired because he needed the job. *Id.* at 24, Dep. Tr. 47:12-25. Belue was told "don't talk about this instance" as "there was, like, . . . an ongoing process." *Id*. at 20-21, Dep. Tr. 43:25-44:2

After the first meeting, Belue testified he headed back to the floor, but Plaintiffs pulled him away to ask him what was going on with Almestica. (ECF No. 27-11 at 7), Belue Dep. Tr. 51:7-20. Belue claimed he did not say anything to Plaintiffs, looked back at Bound's office, and informed Plaintiffs that "they just told us, don't talk about this." *Id*., Dep. Tr. 51:21-24. However, he did tell Plaintiffs that he was not forthcoming with Bound about Almestica's use of the n-word.[23] (ECF No. 32-2 at 22), Dep. Tr. 45:10-15. Once Diprete and Dunn came through, Belue went into Bound's office for the second meeting, during which he told Bound that Almestica had said the n-word, and he prepared a statement to that effect.[24] *Id*. at 22-23, Dep. Tr. 45:16-24, 46:8-

[22] Diprete testified Bound and Edward were yelling at each other, and Bound told Edward "to shut the f[***] up" and "get the f[***] out." (ECF No. 32-3 at 65, 66), Diprete Dep. Tr. 85:10-12, 86:4-6.

[23] Ray claims Belue "was the one doing all the talking" during the meeting and that Belue "said he was being encouraged not to write a statement. And he told me he wanted to do – well, he told us he wanted to do the right thing." (ECF No. 32-6 at 24), Ray Dep. Tr. 28:2-20. Ray testified that when Cunningham brought Belue into the office, Belue told them that "they were encouraging him to not report it, not to write it down. And he said he wanted to do the right thing." (ECF No. 32-6 at 10), Dep. Tr. 10:16-20. Martin, however, denied hearing anything about Belue's conversation with Bound during their meeting with him. (ECF No. 32-4 at 11), Martin Dep. Tr. 12:7-13.

[24] Belue's statement confirms that he initially told Bound that Almestica had *not* used the n-word that day. (ECF No. 32-2 at 40).

12. Though *Diprete* testified he saw Bound tell Belue what to put in his statement,[25] Belue corroborated *Bound's* testimony, stating no one told him what to write in his statement. (ECF No. 32-2 at 35), Belue Dep. Tr. 59:3-5. Belue acknowledged he was "shaken up," explaining he was focused on keeping his job because he was recently homeless and his mother-in-law helped him get the job. *Id*. at 9, Dep. Tr. 59:5-18. He denied being shaken up due to anything related to Plaintiffs, and he denied that Plaintiffs were trying to intimidate him or were being aggressive towards him in any way.[26] *Id*. at 31, Dep. Tr. 55:15-19. He stated he had a good relationship with Plaintiffs, (ECF Nos. 27-11 at 7, 32-2 at 33), Dep. Tr. 57:22-24, 59:21-23; however, had he known Plaintiffs pulled him away to discuss the Almestica "situation," rather than work, he would not have gone with Cunningham to the office. *Id*. at 11, Dep. Tr. 72:6-22.

After her second meeting with Belue on November 21, 2023, Bound called Eva Komini Jaraczewski ("Komini"),[27] Defendant's CFO,[28] and Komini instructed Bound to conduct a full investigation. (ECF No. 32-5 at 25); Bound Dep. Tr. 76:1-3; (ECF No. 27-3 at 9-10), Komini Dep. Tr. 46:17-47:10. The following day, Bound informed Komini the investigation was complete. Bound testified she was "absolutely" asked her opinion as to how Defendant should proceed with

[25] (ECF No. 32-3 at 72-73), Diprete Dep. Tr. 97:22-98:19.

[26] Diprete, however, corroborated Bound's testimony that Belue mentioned that he felt intimidated by Plaintiffs. (ECF No. 27-7 at 7), Diprete Dep. Tr. 175:10-13. Dunn testified Belue looked "uncomfortable" when he saw Belue with Plaintiffs. (ECF No. 27-9 at 7), Dunn Dep. Tr. 90:16-20.

[27] Throughout the depositions in this case, the parties and individuals deposed refer to this individual as "Komini"; therefore, for consistency, the court will do so herein as well.

[28] (ECF No. 27-3 at 6), Komini Dep. Tr. 21:23-24.

the November 21, 2023 matter. (ECF No. 32-5 at 39, 40), Bound Dep. Tr. 128:20-22, 129:15-25. According to Bound, she participated in a conference call "with Dan, Sal, Eva, and Lori[29]" who:

> asked [her] straight up, what do you want to do. And I said, I want all of them gone. That's what I want to do. I don't need this in the plant. We just finished cleaning all that up. I don't need it again. And that's when they said – Sal said something and then he – and then Eva jumped in and said, look, let us all talk about this. We'll – we'll get back with you in a couple hours and we'll let you know what we decide. And then about ten minutes – ten to 15 minutes later, is when I got the text from Eva. I took – we were – they were already in the manager meeting. I wasn't because I was on the call.

(ECF No. 32-5 at 38-41), Bound Dep. Tr. 127:24-128:14, 129:15-130:4. When Komini texted Bound, she informed Bound that Dan said "just go ahead and terminate all [seven][30] of them." *Id.* at 40, Dep. Tr. 129:5-6. Bound testified the decision to terminate was made *before* talking to Plaintiffs and obtaining their account of what happened on November 21, 2023. *Id.* at 42-44, Dep. Tr. 142:12-144:9.

Though Bound was asked her opinion as to whether to terminate Plaintiffs' employment, Komini testified she "made the broad decision" to terminate and told the individuals at the Duncan facility to carry out the terminations. (ECF No. 27-3 at 10, 35), Komini Dep. Tr. 47:11-18, 118:13-20. She denied knowing Cunningham or Martin's race at the time of their termination.[31] (ECF No. 32-9 at 11), Dep. Tr. 9-15. That said, she acknowledged that, if someone were offended by "a racial slur," "you could summarize [sic] that they might be African American." *Id.*, Dep. Tr.

[29] Lori Neal is Defendant's Human Resources representative in Michigan. (ECF No. 27-1 at 10). The court is unaware of the specific positions or last names of Dan and Sal.

[30] This figure includes Plaintiffs as well as Almestica, Edward, and Payne.

[31] She met with Ray on a prior occasion. (ECF No. 32-9 at 11), Komini Dep. Tr. 148:9-11. Therefore, Komini was aware of Ray's race at the time.

148:19-23. However, she testified race never came up in the discussion to terminate Plaintiffs. (ECF No. 27-3 at 38), Dep. Tr. 152:22-24.

Defendant terminated Cunningham and Ray on November 22, 2023, (ECF Nos. 27-14 at 1; 29-1 at 1), and it terminated Martin on November 27, 2023, (ECF No. 28-1 at 1).[32] Bound provided the following details on the Correction Counseling Form for each plaintiff:

> On Tuesday 11/21/23 Dylan Dunn and Ken Diprete came to my office to let me know that they had passed by the supervisors' office and Elisha Cunningham, Shantel Ray and Lakeisha Martin were surrounding Jacob Belue and questioning him. ***Jacob then came to my office shaking and said he does not want to be involved in any of this***. I asked him what had happened and he stated that "***those girls***" ***pulled him off the E-Coat line and asked him to come to the supervisors' office***. Jacob stated that he assumed it was work related but they then started questioning him about what was said with [Almestica], management and HR, when Dylan and Ken entered the room and asked what was happening Lakeisha and Shantel quickly left the room and Elisha said nothing.
>
> This behavior is completely unacceptable and will not be tolerated by R&E under any circumstances. [Plaintiffs] chose to insert [themselves] in a situation [they] ha[d] no place in. [***Plaintiffs***] ***took advantage of the situation and attempted to intimidate another employee***. This behavior creates a hostile work environment.
>
> The following Rules/Standards of Conduct state that Violations of these standards, which prohibit the indicated behavior, will, in the discretion of the Company, result in discipling up to and including termination: ***Threatening, intimidating, or assaulting a supervisor, co-worker, customer, or other person whom you interact with at work***.

---

[32] Cunningham testified she spoke with Bound and Deron Johnson, the plant manager, on the morning of November 22, 2023. (ECF No. 32-1 at 40), Cunningham Dep. Tr. 86:21-87:4; (ECF No. 27-1 at 7). They asked Cunningham what she, Martin, and Ray were speaking about, and Cunningham told them they were discussing "the matter with [Almestica] and [they] felt like wasn't nothing being done about it." *Id*. Cunningham claims they told her she "could not be talking about the fact of [Almestica] calling [them] the n-word." *Id*. at 41-42, Dep. Tr. 87:7-88:5. Cunningham learned she was being terminated later that morning. *Id.* at 40, Dep. Tr. 86:15-17.

When Martin returned to work on November 27, she met with Bound and Johnson who told her they had "no choice but to terminate" her due to her decision to insert herself in the conversation with Cunningham, Ray, and Belue. (ECF No. 32-4 at 17), Martin Dep. Tr. 72:6-18.

(ECF Nos. 27-14 at 1; 28-1 at 1; 29-1 at 1) (emphasis added). While the reason provided for their termination on these forms dated in *2023* is based on Plaintiffs' alleged acts of intimidation towards Belue, which Plaintiffs deny, during her deposition on August 20, *2025*, Komini testified Plaintiffs were terminated for violating a number of Defendant's rules of conduct, including: (1) leaving company property during working time without permission; (2) taking unauthorized breaks; (3) intimidating Belue; and (4) failing to cooperate with an investigation. (ECF No. 27-3 at 17-27), Komini Dep. Tr. 75:25-85:13.

After learning Defendant had resolved Plaintiffs' National Labor Relations Board charges by offering them reinstatement and paying them their lost wages, Bound provided the following testimony:

> Let me tell you what I see. I see, I got three black people that are complaining and bitching and we're going to use racial bullshit to allow them to get away with whatever the hell they want. Which is exactly what y'all did and it's wrong. Bullshit. That's what I see. I don't care about this. I don't care about you, [Defendant], any of them, any of this, don't care. This is crap and that's wrong.
>
> You know what you're doing. You're letting every business know, hey, if you're white, Hispanic or anything but black, don't go to work for any other company because if you're not black, you're going to get away with whatever the hell you want to get away with. And that's exactly what I see here. They did not have protected activity in this. They pulled somebody off a line who was working a very dangerous line, responsible for it, knowing they're not allowed to.
>
> . . .
>
> Those people acted like they owned the place. You know why they did? Because they also know to play the law and they do it every chance they get.
>
> So I don't want to hear it. And when I say they, I am referring to those employees period. Seen it since day one. I'm so sick of this. Sick of the whole thing. You play your damn games. I'm done. . . .

(ECF No. 32-5 at 49-52), Bound Dep. Tr. 167:9-168:1, 169:24-170:6.[33]

Diprete testified "Bound was a horrible HR person," "had a temper," and "[i]f she didn't like you, you weren't going to have a job very long." (ECF No. 32-3 at 22, 47), Diprete Dep. Tr. 64:4-5, 180:24. He also testified Bound and Johnson had the final say in Plaintiffs' terminations. (ECF No. 32-3 at 25), Diprete Dep. Tr. 42:2-8. With this background in mind, the court will proceed with addressing the disputed issues regarding Plaintiffs' remaining claims.

### B. Job Performance

In order "to create a triable issue of fact as to satisfactory job performance, a plaintiff must demonstrate that [s]he 'was performing h[er] job duties at a level that met h[er] employer's ***legitimate*** expectations at the time of the adverse employment action.'" *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)) (emphasis added). "[A] plaintiff need not 'show that she was a perfect or model employee. Rather, a plaintiff must show only that she was qualified for the job and that she was meeting her employer's ***legitimate*** expectations.'" *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 380 (4th Cir. 2022) (quoting *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019)) (emphasis added). "[T]he prima facie case requires the employee to demonstrate 'that [s]he was "qualified" in the sense that [s]he was doing h[er] job well enough to rule out the possibility that [s]he was fired for inadequate job performance, absolute or relative." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 514-15 (4th Cir. 2006) (quoting *Loeb v. Trexton, Inc.*, 600 F.2d 1003, 1013 (1st Cir. 1979)). "Critically, under this element, it is the

---

[33] Defendant terminated *Bound*'s employment in December 2024 after Bound was involved in a physical altercation with a Black employee. (ECF No. 32-5 at 7-8), Bound Dep. Tr. 21:3-22:17. She explained the employee "was being a little bit belligerent," so she asked her to leave the line. *Id*. at 7; Dep. Tr. 20-25. In response, the employee pushed Bound, and Bound grabbed the employee's wrist and "told her to knock it off." *Id*. at 8; Dep. Tr. 22:2-8.

perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Giles*, 59 F.4th at 704 (internal quotation marks omitted).

There does not appear to be a dispute amongst the parties that Plaintiffs are qualified for their jobs and that, *prior to* November 21, 2023, they were performing their job duties in a manner consistent with Defendant's expectations. Defendant, rather, argues that, regardless of their qualifications and prior job performance, Plaintiffs cannot meet this element of their prima facie case *solely* because their misconduct on November 21, 2023 violated a number of its policies; therefore, it asserts summary judgment should be granted in its favor on these claims. (ECF Nos. 27-1 at 21; 28-1 at 18; 29-1 at 20; 45 at 15). The court disagrees. While Fourth Circuit precedent permits courts to consider the misconduct that formed the basis for the adverse action at the prima facie stage,[34] Fourth Circuit precedent does not support the relief Defendant seeks.

For example, in *Haynes v. Waste Connections*, the plaintiff texted his supervisor that he would not be coming to work due to having a stomach virus, and the employer terminated him for job abandonment. 922 F.3d at 221-22. In examining the "job performance" element of the plaintiff's prima facie case, the Fourth Circuit recognized the plaintiff had received bonuses during the timeframe in question and that plaintiff's supervisor told him that "everything looks good" approximately one month before the plaintiff's termination. *Id*. at 225. The *Haynes* court concluded "[s]uch evidence raises the reasonable inference—which must be drawn in [the plaintiff's] favor at this stage—that he was performing at a satisfactory level." *Id*. In reaching this conclusion, the *Haynes* court did not consider the employer's allegation that, on the day of his termination, the plaintiff had purportedly violated company policy by texting his supervisor.

[34] *See Warch*, 435 F.3d at 516 (finding "no impermeable barrier that prevents the employer's use of such evidence at different stages of the *McDonnell Douglas* framework").

*Immediately after reaching its conclusion*, however, the Fourth Circuit noted "[a]dditionally, although [the employer] argues [the plaintiff] failed to perform satisfactorily by sending a text to [his supervisor] in violation of company policy, a dispute of fact would still exist as to whether [the plaintiff] met his employer's legitimate expectations at that time, because evidence in the record suggests that [the plaintiff] routinely communicated with [his supervisor] via text." *Id.*

Likewise, here, the court finds Plaintiffs have provided sufficient evidence to raise a reasonable inference that they were performing at a satisfactory job level at the time of their termination. Cunningham had been promoted to the position of data entry clerk, and Martin and Ray were quality inspectors.[35] Ray had also earned an auditor certificate. (ECF No. 32-6 at 28), Ray Dep. Tr. 67:6-20. Additionally, Diprete testified Plaintiffs "were never late – out for no reason. They always went the extra mile to make it happen[.]" (ECF No. 32-3 at 18, 19, 25), Diprete Dep. Tr. 42:9-13, 170:1-6, 171:20-24.

Furthermore, even when taking into consideration the misconduct that was cited for Plaintiffs' termination, the court finds that, like in *Haynes*, a dispute of fact exists as to whether Plaintiffs were performing satisfactorily. The initial reason Defendant provided for terminating Plaintiffs' employment was that they intimidated Belue. Plaintiffs deny ever engaging in any intimidating conduct towards Belue, and Belue himself denied Plaintiffs intimidated him in any way. Furthermore, Diprete, who witnessed at least a portion of Plaintiffs' discussion with Belue, albeit from afar, testified he had no evidence Plaintiffs intimidated Belue, but he acknowledged Belue mentioned feeling intimidated during his second meeting with Bound, Dunn, and Diprete. (ECF No. 32-3 at 17, 19), Diprete Dep. Tr. 169:13-16. 171:13-17. Accordingly, a dispute of fact

---

[35] (ECF Nos. 27-1 at 1; 27-4 at 15; 32-1 at 34-35), Cunningham Dep. Tr. 52:3-15; 28-4 at 8, Martin Dep. Tr. 11:6-7.

exists as to whether Plaintiffs engaged in intimidating conduct and, as will be discussed in greater detail below, whether Defendant believed they engaged in intimidating conduct. *See Little v. Cline*, No. 5:17-cv-00228-KDB-DSC, 2019 WL 4936003, at *7 (W.D.N.C. Oct. 7, 2019) (determining the plaintiff "has at least minimally met the 'satisfactory job performance' element" where, prior to his termination, he was told he was "doing fine" and there was a factual dispute over whether he was breaking any company policy as to the specific incident for which he was terminated).

Moreover, a dispute of fact also exists as to whether Defendant's proffered expectations are legitimate. *See Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th Cir. 2021) ("even assuming that we must focus on just the employer's perception at the prima facie stage, a plaintiff may still introduce 'evidence that demonstrates (or at least creates a question of fact) that the proffered "expectation" is not, in fact, legitimate at all'") (quoting *Warch*, 435 F.3d at 517). Defendant now contends Plaintiffs were also terminated for interfering with an investigation and leaving their posts to take an unauthorized break. First and foremost, these reasons were provided nearly two years after the fact, which alone sounds an alarm. Secondly, Belue also interfered with the investigation by not initially providing an accurate account of Almestica's use of the n-word on November 21, 2023. Nevertheless, he was not terminated. Additionally, while Plaintiffs were on the clock at the time of their discussion with Belue,[36] Diprete testified employees would come to him and ask for five minutes off the line to cool down during which they would often have conversations with coworkers. (ECF No. 32-3 at 68), Diprete Dep. Tr. 91:1-13. However, none of

[36] (ECF No. 32-1 at 17, 24), Cunningham Dep. Tr. 20:11-25, 27:10-13; (ECF Nos. 28-6 at 11; 32-6 at 15, 21), Ray Dep. Tr. 15:6-9, 25:6-10, 153:23-25); (ECF No. 28-11 at 11), Belue Dep. Tr. 72:1-5). Martin testified she was on break, but Belue, Cunningham, and Ray were on the clock. (ECF No. 28-4 at 8, Martin Dep. Tr. 11:1-5). Cunningham, however, testified Martin was on her lunchbreak during the earlier encounter that day but not during the meeting with Plaintiffs and Belue. (ECF No. 32-1 at 15), Cunningham Dep. Tr. 18:22-24.

those employees were ever written up or terminated for their conduct. *Id*. Diprete also testified that, while he believes Plaintiffs were wrong for pulling Belue off the floor and trying to speak to him about the investigation, (ECF No. 32-3 at 17), Diprete Dep. Tr. 169:17, he did not believe their behavior called for termination, but rather a write-up or possible suspension at most, *id*. at 18, 19, 25, Dep. Tr. 42:9-13, 170:1-6, 171:20-24. Therefore, even if it were appropriate to consider the initial reason provided for Plaintiffs' termination as well as the additional reasons that were provided two years after the fact, the court finds there is a genuine issue of fact as to whether Plaintiffs were performing their jobs to Defendant's legitimate expectations at the time it terminated their employment.

### C. Different Treatment from similarly situated employees outside the protected class

As to this element, "to establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator 'dealt with the same supervisor, were subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haynes*, 922 F.3d at 223-24 (quoting *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010)). "[A]comparison between similar employees 'will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances.'" *Haynes*, 922 F.3d at 223 (quoting *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993)). Plaintiffs rely on Defendant's treatment of, among others, Almestica and Belue to support their position that "Defendant repeatedly showed racial favoritism to white employees who repeatedly violated company policy." (ECF No. 32 at 20).

Almestica is multiracial, did not have a supervisory role in Defendant's Duncan plant, and shared the same supervisor as at least one plaintiff. *See* (ECF Nos. 27-1 at 1, 6; 29-4 at 5), Ray

Dep. Tr. 8:14-15 (indicating Diprete was Almestica's supervisor as well as Ray's supervisor).[37] He allegedly repeatedly used the n-word or some variation thereof, which had the potential of intimidating, threatening, and/or upsetting employees. Further, while various employees for Defendant recognized that use of the n-word was an immediately terminable offense,[38] Defendant did not terminate Almestica until following what was *at least* his second use of the term at work, despite Almestica also having a number of attendance violations.[39] (ECF Nos. 32 at 21-22; 33 at 23; 34 at 16-17). As such, a reasonable juror could conclude Plaintiffs and Almestica were appropriate comparators.

Additionally, Belue is not Black, did not hold a supervisory role in the Duncan facility, and shared the same supervisor as Almestica and at least Ray. While Defendant argues that "[Plaintiffs'] attempt to rely on Belue as a comparator is disingenuous and unavailing, as Belue's involvement in the situation and specifically the conversation in the office is completely different than that of [Plaintiffs],"[40] Belue admitted to interfering with the investigation by not initially being forthcoming about Almestica's use of the n-word during his first meeting with HR on November 21, 2023. He also engaged, to some degree, in the conversation with Plaintiffs after the investigation. Moreover, as Plaintiffs note, he failed to report Almestica's daily use of the n-word, despite being required to do so by company policy. (ECF Nos. 32 at 21; 33 at 22; 34 at 16; 32-5 at 28, Bound Dep. Tr. 32-5 at 28:7-20). Nevertheless, he was not terminated. Accordingly, the court

---

[37] Defendant does not argue that Almestica and Belue did not share the same supervisor as Plaintiffs.

[38] (ECF No. 32-5 at 21), Bound Dep. Tr. 72:4-9.

[39] (ECF No. 32-3 at 85-89), Diprete Dep. Tr. 132:22-136:25.

[40] (ECF Nos. 27-1 at 22; 28-1 at 19; 29-1 at 20-21).

finds a reasonable fact finder could determine Belue was also an appropriate comparator to Plaintiffs. Plaintiffs have, therefore, established a prima facie case of disparate treatment.[41]

**2. Legitimate, Nondiscriminatory Reason for Adverse Employment Action**

Defendant posits that, even if "[Plaintiffs] could establish a prima facie case of race discrimination . . . , [Defendant] would *still* be entitled to summary judgment on [their] Title VII and Section 1981 discrimination claims because [Plaintiffs were] terminated for a legitimate, nondiscriminatory reason." (ECF Nos. 27-1 at 22; 28-1 at 19; 29-1 at 21) (emphasis in original). Specifically, for pulling Belue off the line and questioning him regarding Almestica's use of the n-word and HR's investigation into the same, "which resulted in him being intimidated and shaken up." (ECF Nos. 27-1 at 23; 28-1 at 19; 29-1 at 21). The court finds Defendant has set forth a legitimate, non-discriminatory reason for Plaintiffs' termination, and it will proceed to address Plaintiffs' argument that this reason is merely pretext for discrimination. *See Wannamaker*, 126 F.4th at 256-57 (providing "[t]he employer's burden at this stage 'is one of production, not persuasion; it can involve no credibility assessment'" (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).

**3. Pretext**

Again, at this stage of the *McDonnell Douglas* framework, it is Plaintiffs' burden to produce sufficient evidence to create a material issue of fact as to whether Defendant's alleged

[41] In support of their disparate treatment claims, Plaintiffs also ask the court to consider Defendant's treatment of Bound, Diprete, Dunn, and Johnson. (ECF Nos. 32 at 22-23; 33 at 24-25; 34 at 17-18). Defendant argues these individuals cannot be considered comparators because they were employed in managerial roles and, therefore, are not similar to Plaintiffs in all relevant respects. Since the court finds Plaintiffs have met this element of their prima facie case through Almestica and Belue, the court need not address whether Bound, Diprete, Dunn, and Johnson are also comparators at this time.

reason for terminating them was not its true reason, but rather a pretext for discrimination. *Wannamaker*, 126 F.4th at 257. According to the Fourth Circuit:

> A plaintiff may establish pretext through two routes. The first is offering evidence that the employer's justification is "unworthy of credence." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089). As the Supreme Court explained in *Reeves*, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id*. at 134, 120 S.Ct. 2097. The second is adducing other forms of circumstantial evidence sufficiently probative of discrimination. *Id*. at 147, 120 S.Ct. 2097. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id*. If the plaintiff makes either showing of pretext, the case must be decided by a trier of fact and cannot be resolved on summary judgment. *Sempowich*, 19 F.4th at 652.

*Id*. at 257.

Plaintiffs contend the reason provided for their termination was pretextual as evidenced by: the conflicting reasons Defendant provided for their termination; that their termination "was an extreme overreaction"; Defendant's "shoddy investigation"; and the disparate treatment of Plaintiffs in comparison to individuals outside of their protected class. (ECF Nos. 32 at 24-27; 33 at 25-28; 34 at 19-21). Plaintiffs also point to Bound's purported racism towards Black people, and Bound's role in their firing.

A plaintiff may show pretext by demonstrating "an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Haynes*, 922 F.3d at 225. Here, the reason Defendant initially provided for Plaintiffs' termination was that they intimidated Belue, which is disputed. Now, it provides that they fired Plaintiffs not only because they intimidated Belue, but also because they took an unauthorized break, removed an employee from the line, and failed to cooperate in an investigation. Defendant's attempt to bolster its termination decision by substantially expanding

upon the initial reason provided two years after the fact lends itself to an inference of pretext. In addition to the supplemental reasons Defendant now provides for terminating Plaintiffs, there are genuine issues of fact as to whether Defendant legitimately expected them to behave otherwise given its failure to discipline other employees under similar circumstances.

Moreover, according to the Fourth Circuit:

> Generally, employers are liable only for the acts of employees with supervisory authority who are empowered to make 'tangible employment decisions.' But form does not triumph over substance: "When a formal decisionmaker acts merely as a cat's paw or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker or the one principally responsible for the contested employment decision, so long as he otherwise falls within the parameters of the discrimination statute's definition of an employer or agent of the employer."

*Ousley v. McDonald*, 648 F. App'x 346, 348 (4th Cir. 2016) (quoting *Hill*, 354 F.3d at 290 (internal citation omitted). *See Gary v. Facebook, Inc.*, 822 F. App'x 175, 182 (4th Cir. 2020) (determining that, while the decision not to promote the plaintiff was technically made by a committee, a jury could still conclude the decision was racially motivated where a racist individual on said committee played a significant role in the decision, prepared all documentation regarding the decision, and was only one of two individuals on the committee who worked with the plaintiff); *Hemingway v. Kroger Co.*, No. 2:22-cv-2457-DCN-KFM, 2025 WL 2462938, *9 (D.S.C. Aug. 27, 2025) (setting forth the requirements to succeed under the cat's paw doctrine as: "(1) [the] supervisor harbored an unlawful animus; (2) [the] supervisor performed an act intended to cause an adverse employment action; and (3) the ultimately decisionmaker merely rubber stamped [the] supervisor's recommendation" then concluding the doctrine did not apply to the case before it because the individual alleged to have harbored discriminatory animus did not participate in the investigation that resulted in HR's recommendation to terminate the plaintiff).

As the magistrate judge recognized, "[g]iven the nature of Bound's testimony, a reasonable jury could find Bound harbored a racial animus that infected her desire to see the employees involved in the November 21, 2023 incidents relieved of their positions and influenced the tone and substance of the information she provided Komini." (ECF No. 43 at 31). Further, Komini put Bound in charge of the investigation, and Bound told Komini the investigation was complete before having spoken to Cunningham or Martin about the events of November 21, 2023. While it was Komini who made the "broad decision to terminate," she based her decision on, among other things, the witness statements and "the events ***that were described to [her] by Bound***." (ECF No. 27-3 at 30), Komini Dep. Tr. 97:3-14 (emphasis added). Notably, none of those witness statements provide that Belue indicated he felt intimidated by Plaintiffs.[42] (ECF No. 29-12 at 1-7). Indeed, Komini testified:

> I have recollection ***that HR stated*** he was shaking when he came to the HR office. I have recollection that it was explained to me that he was very anxious and uncomfortable and nervous when [Dunn and Diprete] discovered him with the three ladies in the office. That's what I was told. ***That's what I made my decision based on***.

(ECF No. 27-3 at 32), Komini Dep. Tr. 111:6-12 (emphasis added).

Additionally, while Defendant tries to minimalize Bound's involvement by pointing to Komini's testimony that it was Komini who made the decision to terminate, there is evidence in the record from which an inference can be made that Komini acted as a rubber stamp for Bound's decision. Bound testified she was asked her opinion as to how Defendant should handle the November 21, 2023 events, and Bound told them she thought everyone involved, including Plaintiffs, should be terminated, which is indeed what happened. Notably, in addition to the

---

[42] At most, Diprete stated Belue felt "nervous and upset about the entire situation." (ECF No. 29-12 at 7).

foregoing, Komini testified Bound "had technically already taken upon herself to terminate [Edward]," and Komini was "confirming that decision." (ECF No. 27-3 at 29), Komini Dep. Tr. 95:8-10. Such testimony further suggests Bound played a significant role in the terminations at issue. *Compare with Ousley*, 648 F. App'x at 348-49 (determining the district court properly focused on the motivations of the defendant's director rather than the individual alleged to be "the puppeteer" because the director "had the sole power to make the contested decision" whereas "the puppeteer" "merely acted as a consultant").

For the reasons stated, Plaintiffs have met their burden of producing sufficient evidence to create a material issue of fact as to whether the reason(s) Defendant provided for their termination was merely pretext for discrimination. As such, the court adopts the magistrate judge's recommendation and denies Defendants' motions to the extent it moves for summary judgment in its favor on Plaintiffs' disparate treatment claims.

## III. Retaliation

Cunningham, Martin, and Ray also each bring causes of action for retaliation in violation of Title VII and 42 U.S.C. § 1981. (ECF No. 1-1). Defendants move for summary judgment on each of these claims as well. (ECF Nos. 27, 28, 29). The magistrate judge recommends the motions be denied with respect to these claims. (ECF No. 43). Defendant objects, (ECF No. 45); therefore, the court will likewise review this portion of the Report *de novo*.

Title VII makes it unlawful for an employer to discriminate against an employee for opposing an unlawful employment practice or because the employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing[.]" 42 U.S.C. § 2000e-3(a). Plaintiffs proceed under the *McDonnell Douglas* framework for their retaliation claims

as well. Thus, to prevail under either Title VII or § 1981,[43] they must show: (1) they engaged in protected activity; (2) their employer took some action against them that a reasonable employee would find materially adverse; and (3) a causal nexus existed between the protected activity and the adverse action. *Massaro v. Fairfax Cnty*., 95 F.4th 895, 902 (4th Cir. 2024). If Plaintiffs are able to make a prima facie showing, the burden shifts to Defendant to offer a legitimate, nonretaliatory reason for its adverse action. *Barnhill v. Bondi*, 138 F.4th 123, 138 (4th Cir. 2025). If Defendant meets this burden, "'the burden then shifts back to the . . . employee to prove by a preponderance of the evidence' that the employer's purported reason is pretext for intentional retaliation." *Id*. (quoting *Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 63 (4th Cir. 2023)).

**1. Prima Facie Case**

Regarding their prima facie case, the issues are whether Plaintiffs engaged in a protected activity and whether Plaintiffs can demonstrate a causal connection between the activity and their termination.

**A. Protected Activity and Causal Connection**

"Protected activity under Title VII includes complaints of discrimination based upon 'race, color, religion, sex or national origin.'" *Landino v. Sapp*, 520 F. App'x 195, 198 (4th Cir. 2013) (quoting *Balazs v. Liebenthal*, 32 F.3d 151, 159 (4th Cir. 1994)). "Protected activities fall into two distinct categories: participation or opposition." *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 259 (4th Cir. 1998). Activities that constitute participation are . . . : (1) making a charge ; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding or hearing under Title VII." *Id*. In contrast, "[t]o qualify as opposition activity an

[43] "'A prima facie retaliation claim under 42 U.S.C. § 1981 has the same elements' as a Title VII retaliation claim." *Hashem v. Park Commcns, LLC*, No. 5:25-cv-252-BO-BM, 2025 WL 3063127, at *2 (E.D.N.C. Nov. 3, 2025) (quoting *Boyer-Liberto*, 786 F.3d at 281).

employee need not engage in the formal process of adjudicating a discrimination claim. Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Id.* (internal citations and quotations omitted). "To warrant protection, the employee's perception of a violation must be objectively reasonable under the circumstances known to [her]." *Strothers*, 895 F.3d at 328 (quotations omitted).

As to the causation element, the Fourth Circuit has explained:

> A plaintiff may attempt to demonstrate that a protected activity caused an adverse action through two routes. First, a plaintiff may establish that the adverse act bears sufficient temporal proximity to the protected activity. Second, a plaintiff may establish the existence of other facts that alone, or in addition to temporal proximity, suggests that the adverse employment action occurred because of the protected activity.

*Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783-84 (4th Cir. 2021) (internal citation omitted). "To establish a causal relationship between the protected activity and the termination, a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021).

**i. Martin**

Martin argues she engaged in protected conduct when she met with Belue, Cunningham, and Ray to discuss "the harassment in the workplace and about [Defendant's] failure to properly handle the matter." (ECF No. 34 at 23-25). Defendant disputes Martin's assertion that her conversation with Belue, Cunningham, and Ray constitutes protected activity, stating "Martin's conduct as described herein, in which she questioned and intimidated Belue, who was a witness in an active HR investigation, is ***definitely not*** protected activity under Title VII and Section 1981." (ECF No. 28-1 at 22) (emphasis in original). According to Defendant:

> Martin was neither participating in an ongoing investigation nor opposing discriminatory practices at [Defendant's workplace] when she, along with her co-plaintiffs, pulled Belue off the floor and into the office under false pretenses in order to question him regarding a confidential matter they knew HR was actively investigating and handling.

(ECF 28-1 at 22). The court agrees with Defendant.

"To determine whether an employee has engaged in legitimate opposition activity we employ a balancing test. We balance the purpose of the Act to protect persons engaging reasonably in activities opposition discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel."[44] *Laughlin*, 149 F.3d at 259. The court finds the balancing test weighs against finding Martin's conduct constitutes protected activity.

Martin testified that, for five to ten minutes, she and her co-workers "discussed what happened as far as the N-word being used on the other end of the floor" and then she asked Cunningham to pull Belue off the floor because she was "just curious" about his discussion with HR.[45] (ECF No. 28-4 at 7), Martin Dep. Tr. 10:7-20. This discussion did not involve anyone employed in a managerial or supervisory role by Defendant. *See Kubicko v. Ogen Logistics Servs.*, 181 F.3d 544, 552 (4th Cir. 1999) (stating "as long as an employee complains ***to his or her employer*** or participates in an ***employer's*** informal grievance procedure ***in an orderly and nondisruptive manner***, the employee's activities are entitled to protection under [Title VII's] opposition clause") (emphasis added), *abrogated on other grounds by Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243 (4th Cir. 2015). Furthermore, unlike Cunningham and Ray, there is no

[44] Plaintiffs do not argue their conduct constitutes participation activity.

[45] Martin estimates their conversation with Belue lasted an additional five minutes. (ECF No. 34-4 at 11), Martin Dep. Tr. 12:19-22.

indication Martin ever expressed any opinions or feelings regarding the conduct that formed the basis of her discussion with Belue and her co-plaintiffs to anyone employed by Defendant in a supervisory role. While the lack of employer involvement alone *may* not be dispositive of the issue, the court finds it also significant that, at the time of the discussion, Ray and Cunningham were on the clock when Martin, who was on break, told Cunningham to pull Belue, who was also on the clock, off the floor. (ECF No. 32-4 at 9), Martin Dep. Tr. 10:12-13. Such conduct was disruptive to Defendant's operations. *See Armstrong v. Index J. Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (recognizing Title VII's opposition clause "“was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work”). For these reasons, the court concludes Martin has not established that she engaged in protected activity. As such, the court declines to adopt the magistrate judge's recommendation, grants summary judgment to Defendant as to Martin's retaliation claims, and such claims are hereby dismissed.

**ii. Ray**

Ray asserts she engaged in protected activity when she, among other things, reported Almestica's use of the n-word to both Diprete and Bound on November 21, 2023. (ECF No. 33 at 20-30). The court agrees. *See Roberts*, 998 F.3d at 122 (finding the plaintiff "certainly engaged in protected activity" when he complained of harassment to multiple supervisors as well as to the Human Resources manager); *Boyer-Liberto*, 786 F.3d at 281 (stating "[e]mployees engage in protected oppositional activity when, inter alia, they 'complain to their superiors about suspected violations of Title VII'") (quoting *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543-44 (4th Cir. 2003)).

After reporting Almestica's conduct, Ray went to Bound and prepared a statement. Komini was aware Ray engaged in protected activity because she reviewed all the witness statements when

making the "broad decision" to terminate. Because Ray engaged in protected activity within twenty-four hours of her termination, the court finds Ray has also met the causation element. *See Massaro*, 95 F.4th at 902 (stating "[w]e have held that causation can be inferred when 'the employer takes adverse employment action against an employee shortly after learning of the protected activity'") (quoting *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 656 (4th Cir. 2017)); *Mercer v. Arc of Prince Georges Cnty., Inc.*, 532 F. App'x 392, 398 (4th Cir. 2013) (finding the plaintiff demonstrated this element where she was terminated within two weeks of returning from FMLA leave and stating "[w]hile evidence as to closeness in time 'far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality'") (quoting *Yashenko v. Harrah's N.C. Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006)).

**iii. Cunningham**

Cunningham contends she engaged in protected activity when she, among other things, reported Almestica's use of the n-word to Bound, Diprete, and Dunn between August or September 2023 to November 2023. (ECF No. 32 at 28-31). The court agrees. *See Roberts*, *supra* at 122; *Boyer-Liberto*, *supra* at 281.

Nevertheless, Defendant argues Cunningham cannot establish the requisite causation between the protected activity and her termination because Komini, who Defendant maintains made the ultimate decision to terminate Cunningham, was not aware of Cunningham's prior reports concerning Almestica.[46] (ECF No. 27-1 at 26). "Thus," according to Defendant, "it is impossible for [Defendant] to have retaliated against Cunningham for a protected activity the

---

[46] Komini did not recall any conversations prior to November 21, 2023, about Cunningham reporting any complaints about the use of the n-word. (ECF No. 27-3 at 8), Komini Dep. Tr. 41:15-20.

decision-maker was not even aware of when making the final determination that Cunningham would be terminated." *Id.* However, as stated, viewing the evidence in the light most favorable to Cunningham, there is evidence in the record from which a jury could find that Bound was involved in the decision-making. As stated, there is also testimony that Cunningham reported Almestica's use of the n-word to Bound at the end of October or early November 2023. As such, the court finds Cunningham has met both the protected activity element and the causal element of her prima facie case. *See King v. Rumsfield*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (concluding a two-and-a-half month gap between the protected activity and an adverse employment action sufficiently narrow to establish the causation prong of the prima facie case solely on the basis of temporal proximity).

**2. Legitimate, Nonretaliatory Reason for Adverse Action**

Defendant contends it had a legitimate, non-retaliatory reason for terminating Plaintiffs' employment due to their conduct involving Belue. (ECF Nos. 27-1 at 27; 28-1 at 23; 29-1 at 25). The court finds that Defendant has met its burden in identifying a non-retaliatory reason for the terminations and will proceed to address Cunningham's and Ray's argument that this reason was pretext for retaliation.

**3. Pretext**

To meet their burden of showing Defendant's reason for their termination is pretext for retaliation, Cunningham and Ray "must establish 'both that the employer's reason was false and that [retaliation] was the real reason for the challenged conduct." *Foster*, 787 F.3d at 252. In arguing the reason provided for their termination is pretextual, Plaintiffs again point to: "Defendant's shifting reasons for termination"; "Defendant's overreaction to the allegations against them"; "Defendant's shoddy investigations"; and "Defendant's preferential treatment of employees outside their protected class." (ECF Nos. 34 at 25). Additionally, they rely on testimony

of Belue and Diprete, which they assert "confirms [they] did not do what Defendant accused [them] of" and that they "did not deserve to be fired." (ECF No. 34 at 25-27). They also contend Bound's "racism and resentment of the Black Employees" as well as her alleged fabrications of the meeting between Plaintiffs and Belue show pretext. (ECF No. 34 at 25-26). Defendant maintains that Plaintiffs cannot present evidence that its reason was pretextual for discrimination. (ECF Nos. 27-1 at 27; 28-1 at 23-23; 29-1 at 25-26). For the reasons stated herein above, the court also finds Cunningham and Ray have met their burden of showing Defendant's stated reason for terminating Cunningham and Ray was pretext for retaliation. Accordingly, Defendant's motions are denied to the extent it seeks summary judgment as to Cunningham's and Ray's retaliation claims.

**CONCLUSION**

In summary, the court adopts in part and rejects in part the magistrate judge's recommendation, (ECF No. 43), denies Defendant's motion for summary judgment as to Cunningham, (ECF No. 27), grants in part and denies in part Defendant's motion for summary judgment as to Ray, (ECF No. 29), and grants in part and denies in part Defendant's motion for summary judgment as to Martin, (ECF No. 28). Ray's hostile work environment claims and Martin's retaliation claims are hereby dismissed. Cunningham's claims for hostile work environment, disparate treatment, and retaliation, Ray's claims for disparate treatment and retaliation, and Martin's claims for disparate treatment shall go forward.

**IT IS SO ORDERED.**

s/Timothy M. Cain
Chief United States District Judge

September 1, 2026
Anderson, South Carolina

**NOTICE OF RIGHT TO APPEAL**

The parties are hereby notified of the right to appeal this order pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.